[No. 12092. In Bank. — March 18, 1889.]

## J. C. HOULT ET AL., RESPONDENTS, v. E. J. BALDWIN, APPELLANT.

SALE — MANUFACTURED ARTICLE — WARRANTY — APPEAL — REVIEW OF EVIDENCE. — In an action for the price of a combined header and separator, which was manufactured by the vendor, when the evidence shows, without substantial conflict, that the machine was not reasonably fit for the purpose for which it was ordered, and broke down by its own weight when moved, and that a prompt offer to return the machine was made after its insufficiency was discovered, a verdict for the plaintiff will be set aside upon appeal, as not supported by the evidence.

ID. — EVIDENCE — OPINION OF NON-EXPERT. — The evidence of persons not experts, who testify without knowledge, as to their opinion of the sufficiency of the construction of a manufactured article, with the manufacture of which they had nothing to do, is not admissible, and is entitled to no weight in arriving at a conclusion as to the sufficiency of the evidence to sustain the verdict.

APPEAL from a judgment of the Superior Court of San Joaquin County.

The facts are stated in the opinion of the court, and in the decision rendered upon the former appeal in the same case, reported in 67 Cal. 610.

*Lloyd & Wood,* and *Louttit, Woods & Levinsky,* for Appellant.

*J. C. Campbell,* and *W. L. Dudley,* for Respondents.

WORKS, J.— Action to recover the price of a combined header and separator. This is the second appeal to this court. The facts will be found stated in *Hoult* v. *Baldwin,* 67 Cal. 610. In its former decision reversing the case, this court said that the principal questions for the jury were: 1. Would the machine, as sent forward, do good work in cutting and thrashing ordinary grain from one to five feet in height? 2. Was it reasonably fit for the purpose for which it was ordered? 3. Was there any latent defect arising from the process of manufacture not disclosed to the buyer?

Upon the second trial, these precise questions were put to the jury in the form of special interrogatories. The first and second were answered in the affirmative, and the third in the negative. A general verdict was also returned for the plaintiffs for the amount of their claim with interest, and judgment was rendered accordingly. There was a motion for a new trial by the defendant, which was denied, and he appeals from the order denying him a new trial, and from the judgment.

The principal question presented on this appeal is as to the sufficiency of the evidence to sustain the findings and verdict of the jury.

The sole question presented by the evidence was, whether or not the driving or guiding wheel of the machine was defective or insufficient. There was no question made upon the warranty that the machine would do good work in cutting and thrashing ordinary grain from one to five feet high. It may be conceded, for the

purposes of the case, that the machine would have done the work as warranted, if the grain had been brought to it. The trouble seems to have been that it could not be taken to the grain, for the reason that it was not able to carry its own weight.

We have read the evidence carefully, and find that it is shown, beyond any question, that the machine was taken from the cars, properly put together, and carefully moved, and that it broke down of its own weight; that a second driving wheel, precisely like the first, was furnished, which, upon a second attempt to move the machine, gave way in the same manner. This seems to us to have been almost conclusive proof either that this part of the machine was not of sufficient strength, admitting it to have been properly constructed, or that it was defectively manufactured. From which of these causes the defect resulted, if either, is immaterial. In addition to the fact that this part of the machine gave way as stated, it is shown that the plaintiffs strengthened the same in all the machines sent out thereafter. Besides, it was shown by one Lewis, a witness on the part of the defense, that this casting was improperly constructed. After showing that he was an expert in that kind of work, he says: "For the purpose for which the casting was intended, it was wrong in shape. The plate was thin; at its thickest part it was five eighths of an inch, and the standard was three inches in diameter, and cast solid on this plate. The standard extended in height about twenty or twenty-four inches, tapering about two inches, and at the end of that point there was a wrought-iron band shrunk on, and at the end there was a pintle. This wrought iron had nothing to do with the broken part. The plate and standard were all one casting, and it was bolted through the plate to the push-beam. The lower pintle came out from the end of the beam. The upper one was at the upper end of the tiller-post, and the wheel was attached to these pintles, and this made the guiding

apparatus of the machine. The plate being thin, and the standard being three inches in diameter, it would be weakened at the point of contact between the standard and the plate, on account of the difference in cooling. One would cool much faster than the other. The plate would cool much faster. That is a great difficulty foundry-men have to contend with, and this casting was wrong in shape for the purpose for which it was intended. It would be liable to break, and the place where it would break would be the point of contact between the standard and the plate, in the same way in which that one was broken which was exhibited to me."

The plaintiffs each testify, in general terms, as to the condition and fitness of the machine for the work to be done. Mr. Young says: "The castings for it were made in the Globe foundry and machine-shop, in Stockton. George Lissenden did the wood-work. I shipped the machine about the twelfth day of May, 1878. I took the machine from the shop and loaded it on the cars. We took part of it apart on the platform at the depot. We had four animals to draw it from the shop to the depot. I cannot say how many blocks we crossed. The streets were in an ordinary condition. We crossed all the street crossings. We crossed two railroad tracks. The turning wheels stood at an angle of about forty-five degrees while crossing the railroad,—I mean the tiller-wheel, or the standard of the tiller-wheel that was broken. I put it upon the cars. It was in good condition when we put it upon the cars; everything was all right; there was nothing wrong that I could see. I started seven of the same make that year, and they all worked well in grain from one to five feet in height."

He further stated that the machine was "capable of cutting grain from one to five feet in height."

It was shown by the witness that Mr. Hoult superintended the making of the machines, and that the witness saw them in course of construction, and saw the parts

put together; that they put out thirteen of the machines that year, the other twelve being duplicates of this one, the one sold to the defendant being the first; and that the principle of this machine was precisely the same as a number of other machines that did work; after which he further testified: "I was on ten of them that season,— started ten of them myself in the field in Merced, in grain from two and a half to five feet high, on the land of Mr. Huffman, Merced County, on level land. Have seen the same kind of machine working since that time. The guiding wheels of all the machines were made at the Globe foundry. In taking the machine from the shop to the depot, and crossing the street crossings, and crossing the railroad track, and in making this turn at the depot, I consider a much harder test was made of the machine than any test in the field. I consider it a severe test. The machine was all right when taken apart and put upon the cars. I am satisfied the machine will do all that is claimed for it. In my opinion, it is fit for the purpose for which it was made. There was no latent defect arising from the process of manufacture not disclosed to Mr. Baldwin."

It will be seen that this witness had nothing to do with the manufacture of the casting, and he so testifies in express forms. As to the only question, therefore, about which there was any real controversy, he was not an expert, and should not have been allowed to give an opinion, and would not have been, probably, if the objection to his giving an opinion had been confined to that branch of his testimony. Having given an opinion, under such circumstances, it was entitled to no weight whatever, and should be given none in arriving at a conclusion as to the sufficiency of the evidence.

After testifying that the other machines were exact duplicates of the one sold to defendant, he was asked on cross-examination whether the other machines were

not strengthened where this one is claimed to have been weak, and answered, "I don't know."

Mr. Hoult, the other plaintiff, testified as follows: "The machine shipped to Baldwin was well constructed. In my opinion, it would do good work in cutting and thrashing ordinary grain from one to five feet in height. I think it was reasonably fit for that purpose. I don't know of any hidden defects in that machine through any casting or wood-work. My opinion is based upon seeing duplicates of the same machine work,—I mean a machine of a similar pattern in all respects. After the telegram for this second plate, we came to the conclusion there might be something wrong, and put a strap on it to make it stronger. Some of them had gone out without that, though, but those that remained we put a strap on, and then, after that, we added more metal to the plate, for they would break occasionally. There was never one broke before to my knowledge. We made the plates after that seven eighths of an inch thick. I saw the machine running with a plate similar to the one on Baldwin's machine during the year 1878. It was at Hughes's place at Waterford, Stanislaus County. The grain was from two to four feet,—ordinary grain. I did not use the machine. I went there to look at it. It worked well. The tiller-post and plate on that machine were of the same dimensions as the one shipped to Baldwin,—the same kind. It did not have the strap on it, or anything else; but I will say it broke afterwards. It broke the next season. I think the machine sent to Baldwin would have done what we guarranteed it to do under proper handling. I could not say whether the machine sent to Baldwin was the first one or not in the year 1878. My recollection is, that two, maybe three, machines were sent out during 1878, after that sent to Baldwin, on which the improved tiller-post was not placed. My recollection is clear in regard to one machine that went out, and that is of the machine of which

I have spoken, and in which the tiller-post broke down the subsequent year."

It thus appears that as to the matter in controversy here this witness, like the other, was not an expert, and was testifying without knowledge. His testimony makes it clear that but one machine like the one sold to the defendant was sent out, and that it gave way at this same weak spot, though not so soon as the one sold to the defendant.

One Lissimer was called for the plaintiffs, and testified that he had been a manufacturer of agricultural implements for more than forty years, and that the material used in the machine was "first-class, number 1 material, and done satisfactory to the contractor"; that during his experience he had been using castings such as were used in these machines; that he tapped all of the castings, by way of testing whether they were perfect or not, and that there were no defects in any of the castings when they were put on; and that the shrinking was done by one Mosey, who was a competent man. It may be doubted whether this witness was shown to be an expert in the matter of these castings; but, admitting that he was, he testified as follows on the direct question in controversy:—

"Q.—State to the jury whether or not, from your knowledge of the construction of these machines, from your knowledge of the material that went into them, and from your knowledge as a machinist, for the purpose for which they were manufactured and put together, whether or not they were fit for the purpose of cutting and thrashing ordinary grain from one to five feet in height.

"A.—I do not care to answer that question direct. Men have various opinions in reference to that. I can state that the quality of the material was first-class, and the work done first-class, according to the contract; but there are various opinions as to the qualifications of these machines in the field. I will testify that I did

not intend to say that the machine is just as I would have done it, but it was built according to contract, and the work was done first-class, and the material was first-class."

And on cross-examination:—

"Q. (by counsel for defendant).—I understand you to say, in answer to a question by counsel on the other side, that you knew and gave it as your opinion, because of your knowledge and experience in the business, that the tiller-post sent Baldwin was a sufficient casting for that purpose.

"A.—Yes, sir; it was a sufficient casting, in my opinion, with the strap or stirrup.

"Q.—Without the strap or stirrup was it sufficient?

"A.—I don't think it was. I don't think it was weak around the foot of the post."

The strap or stirrup was one of the improvements made in other machines subsequent to the sale to defendant.

The evidence of this witness weakened, rather than strengthened, the plaintiff's case.

This is the substance of the evidence on this point. Applying to it the law as declared by this court on the former appeal, it seems to us that the findings and verdict of the jury are entirely without evidence to support them. There were objections to some of the evidence, particularly the opinions given by the plaintiffs; and some of the instructions were complained of, but the conclusion we have reached renders it unnecessary to consider these questions. Upon the main issue in the case, in fact the only one material to have been considered, there was no substantial conflict in the evidence, and the verdict and judgment must be set aside for that reason.

Judgment and order appealed from reversed and cause remanded.

SHARPSTEIN, J., BEATTY, C. J., and THORNTON, J., concurred.